IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Case No. 1:17-cr-00051 |
| Plaintiff, | : | Judge Susan J. Dlott |
| v. | : | **ORDER DENYING DEFENDANT'S** |
| | : | **MOTION TO SUPPRESS EVIDENCE** |
| TRISTON AMISON, | : | |
| Defendant. | : | |

This matter is before the Court on Defendant's Motion to Suppress Evidence (Doc. 19), which the United States has opposed (Doc. 21). An evidentiary hearing was held on July 26, 2017. For the reasons that follow, Defendant's Motion will be DENIED.

I.   **FACTS**[1]

On January 26, 2017, Cincinnati Police Officer Michael Smith, assigned to District 5, was on a routine patrol in the Northside neighborhood during second shift. It was dark outside and the weather was a wintery mix of precipitation. Officer Smith—at the wheel—and his partner, Officer Greg Harmon—sitting in the passenger seat—were driving in a fully-marked cruiser equipped with a mobile video recorder. Both officers also were wearing body cameras.

While heading south on Kirby Avenue, Smith observed a vehicle turn left (out of a Marathon gas station) on to Kirby and drive through a red traffic light at the intersection of Kirby and Chase Avenues. The vehicle's left turn signal was still blinking as it crossed Chase. Officer Smith stopped at that light, where cars were traveling east to west, but then activated the lights

---
[1] The facts are drawn from the testimony adduced and the digital recordings admitted into evidence (Government Exhs. 1 and 2) at the July 26, 2017 hearing.

1

on his cruiser to proceed through the intersection and pursue the vehicle. By this point, one car had turned left on to Kirby from Chase and thus was in-between the cruiser and the vehicle, which now was signaling to turn right (west) on Colerain Avenue. Smith believed that the vehicle was attempting to elude him. The car in-between had pulled over—presumably in reaction to the cruiser lights—allowing Smith to turn right on to Colerain, where he observed the vehicle turning right (north) again on Florida Avenue, a residential street. When Smith turned on to Florida, the vehicle was pulled over with its hazard lights flashing.

Officer Smith exited his cruiser and approached the vehicle with caution because the windows were tinted. He asked the driver to roll down the windows. The driver, a male, complied immediately and put his hands up in the air. Smith told the driver he stopped him because he "*ran the red light there at Kirby and [ ] Chase.*" He asked the driver for identification. The driver did not produce a license, but instead recited his name, date of birth, and social security number. Smith asked the passenger, a female, for identification, and she handed him her license. Back in the cruiser and using his mobile data computer, Smith learned that the driver, Triston Amison, did not have a valid driver's license. Also, Mr. Amison had a number of "red tabs" or "alerts" associated with his name with respect to weapons according to the Regional Crime Information Center ("RCIC"). In contrast, Mr. Amison's passenger—now known to be his girlfriend—was properly licensed to drive and in fact owned the vehicle. She had no criminal record.

Officers Smith and Harmon re-approached the vehicle with the intention to have Mr. Amison and his girlfriend switch places inasmuch as she was licensed and he was not. The following dialogue ensued. Smith, on the driver's side of the vehicle, told them, "*I'm going to have to have you stand up, step out here, and you guys are going to have to switch out, all*

*right?*" He directed Mr. Amison to move to the back of the car, "*Back there with my partner,'k?*" Smith asked, "*You don't have nothin' on you?*" and "*Mind if we pat you down for weapons or anything like that?*" The recording indicates that Mr. Amison replied, "*No, sir*" to the first question and raised his arms in response to the second. Smith then asked, "*There's nothin' illegal in that car?*" "*No, sir*" was Mr. Amison's answer, with Smith remarking, "*Now I'm kind of getting a smell of marijuana.*" Mr. Amison denied having any marijuana on him, but "*to be honest*" admitted to smoking earlier in the day while wearing the same clothes. Smith: "*As soon as you walked back, man, I could smell it [ ] in your trail.*"

His pat-down complete, Officer Smith tells Mr. Amison, "*Sir, you can put your hands [d]own and step over here—I just want you out of the street.*" Continuing, "*You say there's nothing in the car?*"—"*No, sir*"—"*You mind if I look?*" Mr. Amison, gesturing toward the car, "*I mean, yeah.*" Smith follows up: "*Yeah, I can look?*" Mr. Amison, now gesturing toward his girlfriend, says, "*I mean --.*" Smith, in turn, asks Mr. Amison's girlfriend, "*Is that fine? Do you care if I look in your car?*" She points to the car and appears to say, "*Yeah*" with Smith responding "*Ok.*"

Officer Smith tells his partner, "*If I don't find nothin' I wouldn't worry about cutting a ticket - just have them switch out,*" and then advises Mr. Amison and his girlfriend, "*All right, as long as you ain't got nothing in the car we'll just have you guys, uh, we'll just have you guys switch out and have you guys on your way, all right?*" As he begins the search, Smith addresses Officer Hutchings, who arrived on scene before Smith initially approached the vehicle: "*Hey Hutchings, Hutchings, you can take that side if you want, just so we can get them out of here quicker.*" Within minutes, Smith finds the bag with the gun inside under the driver's seat and instructs his fellow officers to "*Grab him, grab him.*"

3

Mr. Amison subsequently was charged with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). (Doc. 3.)

## II. LEGAL STANDARD

"An ordinary traffic stop by a police officer is a 'seizure' within the meaning of the Fourth Amendment." *United States v. Blair*, 524 F.3d 740, 748 (6th Cir. 2008) (citing *Delaware v. Prouse*, 440 U.S. 648, 653 (1979)). Thus, evidence seized during an illegal traffic stop "must be suppressed as 'fruits of the poisonous tree.'" *Id.* (citing *United States v. Hill*, 195 F.3d 259, 264 (6th Cir. 1999) (quoting *Wong Sun v. United States*, 371 U.S. 471, 484 (1963))). It is well-established, however, that a police officer "lawfully may stop a car when he has probable cause to believe that a civil traffic violation has occurred." *United States v. Jackson*, 682 F.3d 448, 453 (6th Cir. 2012).

"To justify a pat[-]down of the driver . . . during a traffic stop, [a] police [officer] must harbor reasonable suspicion that the person subjected to the frisk is armed and dangerous." *Arizona v. Johnson*, 555 U.S. 323, 327 (2009). Reasonable suspicion is based on the totality of the circumstances and requires "'a particularized and objective basis'" for suspecting that the person is armed and dangerous. *United States v. Payne*, 181 F.3d 781, 788 (6th Cir. 1999) (quoting *United States v. Cortez*, 449 U.S. 411, 417–18 (1981)).

A warrantless search of a vehicle lawfully stopped is permissible if the search is supported by probable cause. *United States v. Ross*, 456 U.S. 798, 823 (1982). Probable cause exists when a police officer detects the odor of marijuana emanating from the vehicle or someone exiting the vehicle. *See United States v. Foster*, 376 F.3d 577, 583–84, 588 (6th Cir. 2004).

## III. ANALYSIS

Defendant moves to suppress the evidence seized from the vehicle on January 26, 2017, arguing a Fourth Amendment violation. In response, the United States argues that Officer Smith had probable cause to stop the vehicle that Defendant was driving because he observed it run a red light at the intersection of Kirby and Chase Avenues, a violation of Ohio law. (Doc. 21 at PageID 51, 53.) In addition, Smith and his partner had reasonable suspicion to pat down Defendant for weapons, and, in any event, Defendant agreed to the frisk. (*Id.* at PageID 53–54.) Finally, probable cause supported the warrantless search of the vehicle because Smith detected an odor of marijuana on Defendant's person as he exited the car, and, again, in any event, Defendant—and Defendant's girlfriend, the registered owner of the vehicle—agreed to the search. (*Id.* at PageID 54–55.) Therefore, the firearm found within is admissible at trial.

Defendant, on the other hand, contends "there is a contested issue of fact surrounding the color of the light" at the time the vehicle travelled through the intersection. (Doc. 19 at PageID 43.) More specifically, Defendant contends that the light was yellow rather than red, invalidating the stop and the evidence ultimately seized in connection therewith.

### A. The Stop

Officer Smith had probable cause to pull over the vehicle driven by Defendant. He credibly testified that he observed the vehicle run a red light, and his testimony was corroborated by the recording made by the dashboard camera. As the vehicle pulled out of the Marathon station, the traffic light changed from green to yellow. (Government Exh. 1 at 19:30:55.) The camera tilted up for 2 seconds—rendering the vehicle out of sight of the recording—but was righted by Officer Harmon. At this point, to the Court's eye the light had indeed turned red, yet

the vehicle nevertheless proceeded through the intersection.² The traffic stop was proper, and, accordingly, cannot sustain a suppression motion.

   B. The Frisk

Officer Smith harbored a reasonable suspicion that Defendant was armed and dangerous. He credibly testified that he believed the vehicle that Defendant was driving was trying to elude him. And, given its two quick right turns after he activated the lights on his cruiser, Smith's belief was a rational one. On cross-examination, Smith acknowledged that there was a "fair" distance between his cruiser and the vehicle, "at least two car lengths." Still, that distance would not preclude Defendant from seeing the cruiser lights reflected on his windshield and in his rear view mirror before he turned right on Colerain. Tinted windows triggered suspicion, as did the fact that Defendant raised up his hands as soon as he rolled down his window.

Central to his decision to seek permission to frisk, though, were the "alerts" associated with Defendant's name, prompting Officer Smith's remark, "*He's got tons of gun charges.*" In the Court's view, it is no coincidence that these alerts appear as "red tabs" designed to draw immediate attention. Smith was entitled to rely on the accuracy of this information from the RCIC, and his failure to "click through" to learn the final disposition of each alert does not undercut their worrisome nature.

These "particular" and "objective" bases amply support his conviction that Defendant was armed and dangerous, and would have justified a pat-down. Compare United States v. Noble, 762 F.3d 509, 521–26 (6th Cir. 2014). As recited above, however, Defendant voluntarily submitted to a frisk, rendering any constitutional question moot.³

---

² Notably, Mr. Amison did not deny running the light. When asked by Officer Smith why he did so and whether he had a reason, he responded, "*No, sir, I was -- trying to make the light.*"
³ No evidence was seized as a result of the frisk.

6

## C. The Search

Under *Foster*, Officer Smith undeniably had probable cause to search the vehicle. In the process of "switching out," Smith detected the odor of burnt marijuana and Defendant admitted he had smoked earlier in the day.

Although unnecessary, Smith asked permission to search, which he understood[4]—and the Court agrees—was given. The words "*I mean, yeah*" said in response to the question "*You mind if I look?*" could, in the abstract, be interpreted as a "no." But review of the dash cam recording makes clear that Defendant consented to the extent he could, and deferred to his girlfriend, the vehicle's registered owner, to give final approval. Smith picked up on Defendant's cue by asking the girlfriend, "*Is that fine? Do you care if I look in your car?*" and she indicated her approval with a "*Yeah*" and what appears to be a be-my-guest sweep of the hand.

Both consent and probable cause validate the search; hence, the firearm seized then will be admissible at trial.

## IV. CONCLUSION

For the reasons set forth above, Defendant's Motion to Suppress Evidence (Doc. 19) is **DENIED** in its entirety.

**IT IS SO ORDERED**.

Dated: August 28, 2017        S/Susan J. Dlott_____
                              Judge Susan J. Dlott
                              United States District Court

---

[4] As he begins to dismantle the floorboard under the driver's seat, Officer Smith tells Officer Hutchings, "*I kinda like being gentle when they give us consent, just because.*"

7